IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DWIGHT DWAYNE GRANDBERRY,<br><br>             Plaintiff,<br><br>    v.<br><br>G. D. LEWIS, et al.,<br><br>             Defendants.<br>_____/ | No. C 10-4698 SBA (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PENDING MOTIONS**<br><br>(Docket nos. 29, 39, 40, 55) |

## INTRODUCTION

On October 10, 2010, Plaintiff Dwight Dwayne Grandberry, an African-American state prisoner incarcerated at California State Prison Los Angeles, brought this pro se civil rights case under 42 U.S.C. § 1983 alleging constitutional violations against the following Defendants at Salinas Valley State Prison (SVSP):  G. D. Lewis; Correctional Captain D. Mantel; and Correctional Sergeant A. Meza.  Plaintiff alleges that Defendants violated his equal protection rights when they "intentionally, willfully, discriminated against [him] for being black when prison officials locked down all the black inmates . . . based on a battery with a weapon involving two black inmates on yard."  Compl. at 3.

The parties are presently before the Court on Defendants' motion for summary judgment, Plaintiff's cross-motion for summary judgment against Defendant Mantel and Plaintiff's two motions for sanctions.  Having read and considered the papers filed in connection with these matters and being fully informed, the Court, for the reasons set forth below, hereby GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's

cross-motion for summary judgment and his motions for sanctions. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# BACKGROUND

**II.     Factual Summary**

At the time of the events at issue, Plaintiff was housed at SVSP in Facility C, yard one. Decl. Grandberry ¶ 3. Facility C is comprised of eight housing units designated as C1 through C8. Units C1 through C4 share exercise yard one, and units C5 through C8 share exercise yard two. Decl. Mantel ¶ 2. Inmates of all ethnicities are housed in all eight units. Id. Some of these inmates belong to gangs such as the Bloods and the Mexican Mafia. Id. African-American inmates commonly belong to groups such as the Bloods, the Crips, the Hoovers, the Kume and the Black Guerilla Family Group. Decl. Grandberry ISO Cross-Motion ¶ 2. Although the inmates who use the two exercise yards share many of the same attributes and loyalties, there are differences in the group dynamics and cultures between the two yards. Decl. Mantel ¶ 3. As such, incidents occurring in one yard do not always have a connection to the inmates on the other yard; consequently, security measures taken in response to an incident on one yard may not be imposed on the other yard unless intelligence suggests that both yards are involved or likely to be affected by the incident. Id.

E. Moore, Institutional Gang Investigator and supervisor of the Institutional Gang Investigations Unit and the Investigative Services Unit Security Squad at SVSP, states the following in his declaration. Inmates at SVSP segregate themselves by race when they are in areas where they can do so, such as on the exercise yard, in the day room or the dining hall. Decl. Moore ¶ 2. According to Moore, when an inmate moves to a new facility, he typically learns immediately which racial group occupies which particular area of the yard. Id. When weapons or other contraband are found in an area of the yard that has been claimed by a specific racial group, it is likely that the weapons or contraband belong to an inmate or inmates associated with that specific group. Id. ¶ 3. Plaintiff disputes this last fact, claiming

that, during the time he was incarcerated at Facility C, it was common for inmates of other racial groups to hide their contraband and weapons in an area of the yard claimed by another racial group when they were ordered to "prone out" in another racial group's claimed area. Decl. Grandberry ¶ 6.[1]

Moore states that, based on his experience, inmates of particular racial groups tend to favor specific kinds of weapons. Decl. Moore ¶ 5. For instance, he opines that African-American inmates frequently use plastic stabbing weapons, White and Sureno inmates usually use metal weapons and Norteno inmates tend to use plastic stabbing weapons with a sharpened metal tip. Id. Plaintiff, however, asserts that all inmates favor metal stabbing weapons, but would settle for a plastic stabbing weapon if a metal one could not be obtained. Decl. Grandberry ¶ 5.

On January 16, 2009, SVSP inmates Reddic and Wilson (both of whom are Bloods) were involved in a violent altercation on yard one of Facility C. Decl. Mantel ¶ 5; Grandberry Decl. ¶ 3. Pl.'s Ex. B, Mantel Response to Plaintiff's Request for Admission (RFA) No. 12. Inmate Reddic attacked inmate Wilson with a plastic inmate-made stabbing weapon. Decl. Moore ¶ 4. The area of the yard where the altercation took place is claimed by African-American inmates, though it is not exclusive to inmates belonging to any particular gang or group. Id. ¶ 8. Plaintiff disputes this and claims that the area of the yard where the incident took place was claimed by African-American inmates associated with the Bloods. Decl. Grandberry ¶ 3. After the altercation, SVSP correctional staff conducted a sweep of yard one and found the stabbing weapon near the area of the attack. Decl. Mantel ¶ 6. A second plastic stabbing weapon was found in an area of the yard that African-American inmates claimed, though ownership of the second weapon was never established. Decl. Moore ¶ 6.

At the time of the incident, Facility C was considered by staff to be a "hot" yard, meaning that there were an unusually high number of violent inmate incidents there. Decl. Mantel. ¶ 4. It was not uncommon for small or isolated incidents to escalate into widespread

---

[1] Plaintiff does not define the term, "prone out." Plaintiff appears to be referring to instances when a prison officer orders an inmate to lie down on the floor with arms stretched out.

3

violence among inmates. Id. Plaintiff counters that, when he was incarcerated at Facility C, yard one, it was common for small or isolated incidents within a specific African-American group to stay within that group and not spread outside of that group. Decl. Grandberry ¶ 4. Prison staff were unaware of what caused the incident between Reddic and Wilson, whether other inmates could be involved and whether it would trigger reprisals or retaliation from other inmates. Decl. Mantel ¶ 5. Mantel states that, because the fight was between two African-American inmates, she did not think that it was part of an inter-racial conflict. Id.

Based on where the weapons were found and circumstances of the incident, Defendant Mantel concluded that the second weapon likely belonged to an African-American inmate in C1 through C4. Id. ¶ 7. As a result, African-American inmates in C1 through C4 (but not C5 through C8) were placed on a Modified Program. Id. A Modified Program is a program that is implemented to ensure the safety and security of prison inmates and staff. Id. Modified Programs are implemented after an incident involving inmates to determine: (1) the nature of the incident; (2) the identity of the participants in the incident; and (3) if there is any indication of further or future violence. Decl. Moore ¶ 9.[2]

After the implementation of the Modified Program, the investigation continued and a threat assessment report was prepared. Id. ¶ 10. The investigation included cell searches, inmate interviews, and monitoring of inmate mail and calls. Id.; Decl. Mantel ¶ 10. Additional weapons were uncovered, and, as a result, all eight housing units in Facility C were placed on the Modified Program on February 5, 2009 until the investigation could be completed. Id. Plaintiff, an African-American inmate in Facility C, units C1 through C4, was

---

[2] Plaintiff objects to Mantel's statements regarding the Modified Program on the ground that they are not within her personal knowledge. See Plaintiff's Supplemental Opp. at 6. However, as the correctional captain in charge of Facility C, information concerning the Modified Program was within Mantel's personal knowledge and experience. See Mantel Decl. ¶¶ 7-10. In any event, Plaintiff overlooks the other evidence in the record confirming the purpose of the Modified Program. Defendant Moore, for example, has sixteen years with the CDCR and supervises the Institutional Gang Investigations Unit and Investigative Unit Security Squad at SVP. Moore Decl. ¶ 1. In that capacity, Moore is familiar with the use of Modified Programs and its purpose in maintaining security. Id. ¶¶ 8-9. Plaintiff's assertion that the Modified Program was meant to punish African-Americans is conclusory and lacks foundation, and therefore, is insufficient to raise a genuine issue of material fact.

among the inmates placed on the Modified Program. Compl. at 3. The Modified Program remained in effect until March 3, 2009. Pl.'s Ex. B, Mantel RFA No. 11.

Plaintiff filed an administrative appeal asserting that the Modified Program discriminated against him on the basis of his race. Pl.'s Ex. 2, First Level Review of Administrative Appeal. Mantel denied the appeal at the first level of review, in part, because "the handling of inmates by ethnicity and/or subcultures has long been recognized by correctional professionals as an effective technique for establishing and maintaining control of inmate populations during periods of emergency. The procedure is based upon sound penological interest for the institution and the Department." Id.

## II. Procedural History

On May 25, 2011, the Court issued its Order of Service the Court found that Plaintiff stated a cognizable equal protection claim against Defendants Lewis, Mantel and Meza. Dkt. 10.

On May 1, 2012, Defendants filed a motion for summary judgment. (Dkt. 29.) On June 29, 2012, Plaintiff filed a cross-motion for summary judgment as to Defendant Mantel. (Dkt. 40.) On the same date, Plaintiff filed a motion for sanctions, pursuant to Rule 11 of the Federal Rules of Civil Procedure. In his sanctions motion, Plaintiff accuses Defendants of making inconsistent statements with respect to their Answer and Defendant Lewis' declaration filed in support Defendants' motion for summary judgment. (Dkt. 40.)

On July 25, 2012, Defendants filed their opposition to Plaintiff's cross-motion for summary judgment. (Dkt. 44.) On August 9, 2012, Plaintiff filed his reply to Defendants' opposition, and, on August 27, 2012, he filed his opposition to Defendants' motion for summary judgment. (Dkt. 46, 51.)

On September 11, 2012, Plaintiff filed a second motion for Rule 11 sanctions based on allegedly inconsistent statements in Defendant Mantel's declaration and in her declaration in the opposition to Plaintiff's cross-motion for summary judgment. (Dkt. 55.)

Subsequently, the Ninth Circuit Court of Appeals issued a decision that requires pro se prisoner-plaintiffs to be given, at the time a summary judgment motion is filed, "notice of what is required of them in order to oppose" summary judgment motions. Woods v. Carey,

5

684 F.3d 934, 935, 940-41 (9th Cir. 2012).  Consistent with Woods and in accordance with Rand v. Rowland, 154 F.3d 952, 962-63 (9th Cir. 1998), the Court issued an Order explaining to Plaintiff what he must do to oppose a motion for summary judgment.  (Dkt. 54, September 12, 2012 Order at 1-2) (citing Woods, 684 F.3d at 935, 940-41).

On October 5, 2012, Plaintiff submitted his supplemental opposition to Defendants' motion for summary judgment.  (Dkt. 60.)  On October 24, 2012, Defendants submitted their supplemental reply.  (Dkt. 62.)

The aforementioned motions are now ripe for adjudication.

## LEGAL STANDARD

### I. Motion for Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  When the parties file cross-motions for summary judgment, the district court must consider all of the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party.  The Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1135 (9th Cir. 2001).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. The burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. Celotex, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must "make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322-23.

## II.    Section 1983

Section 1983 "provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. Graham v. Connor, 490 U.S. 386, 393-94 (1989). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Ketchum v. Alameda County, 811 F.2d 1243, 1245 (9th Cir. 1987).

## **DISCUSSION**

## I.    Defendants' Motion for Summary Judgment on Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of

7

Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)). A plaintiff alleging denial of equal protection under 42 U.S.C. § 1983 must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent. See Monteiro v. Tempe Union High School Dist., 158 F.3d 1022, 1026 (9th Cir. 1998). A plaintiff must demonstrate that state actors "acted with the intent to discriminate." Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1112 (9th Cir. 1991), superceded by statue on other grounds as recognized in Dominguez-Curry v. Nevada Transp. Dep't, 424 F3d 1027, 1041 (9th Cir. 2005).

When prison officials use racial classifications in response to prison disturbances, they have the burden of showing that "the racial classification was the least restrictive alternative," which means that it was narrowly tailored to meet legitimate prison goals. Richardson v. Runnels, 594 F.3d 666, 671 (9th Cir. 2010) (citing Johnson v. California, 543 U.S. 499, 505-07 (2005)). However, actions that are not motivated by a racially discriminatory purpose are not unconstitutional solely because it has a racially disproportionate impact. Washington v. Davis, 426 U.S. 229, 239 (1976). Furthermore, the government has a compelling interest in maintaining prison security and deference is due to institutional officials' expertise in this area. Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005).

### A. Defendant Meza

At the time of the incident, Defendant Meza was working in Facility C as a Sergeant. Decl. Meza ¶ 2. In that capacity, she had no authority to impose a Modified Program or otherwise impose restrictions on inmates. Id. Following the January 16, 2009, incident, Defendant Meza did not order, authorize or recommend that a Modified Program be imposed on all African-American inmates in units C1 through C4. Id. ¶ 3. Her only role as a Sergeant with respect to the Modified Program was to run the program safely and efficiently, with the objective of returning the inmates to their normal program as quickly as possible. Id. Plaintiff does not dispute these facts. Thus, based on the undisputed record, the Court GRANTS Defendants' motion for summary judgment as to Defendant Meza.

8

### B. Defendant Lewis

Defendant Lewis began working at SVSP on April 11, 2009, <u>after</u> the incident in question had occurred and after the Modified Program was no longer in effect. Decl. Lewis ¶ 2. Defendants thus move for summary judgment as to Defendant Lewis on the ground that he did not undertake any actions that violated Plaintiff's equal protection rights.

Plaintiff argues that in their Answer, Defendants admitted that Defendant Lewis was the Chief Deputy Warden at SVSP at the time of the incident. <u>See</u> Ans. at 3, Dkt. 21. However, Defendants subsequently amended their Answer to reflect that Defendant Lewis was, in fact, <u>not</u> the Chief Deputy Warden at SVSP on January 16, 2009 (the date of the altercation), but that he was the Chief Deputy Warden at SVSP on April 17, 2009, when he signed the Second Level Appeal response to Plaintiff's inmate appeal. Decl. Mossler ¶¶ 2-4, (Dkt. 43); Am. Answer at 3, ¶ B (Dkt. 37).

Plaintiff objects to the Amended Answer on the ground that it violates Civil Local Rule 10.1 (Dkt. 38.) Rule 10.1 provides that, "Any party filing or moving to file an amended pleading must reproduce the entire proposed pleading and may not incorporate any part of a prior pleading by reference." However, Defendants' Amended Answer comports with Rule 10.1. Moreover, Plaintiff has failed to submit any evidence establishing that Defendant Lewis was involved in the decision to implement the Modified Program or that he was working at SVSP at the time of the incident. Since no genuine disputes of material fact exist with respect to Plaintiff's claim against Defendant Lewis, the Court GRANTS summary judgment in Defendant Lewis's favor.

### C. Defendant Mantel

At the time at issue, Defendant Mantel was the SVSP Facility Captain for Facility C and was responsible for the decision to implement the Modified Program after the January 16,

2009 inmate incident. Decl. Mantel ¶¶ 1, 9. Defendants contend that Defendant Mantel is entitled to summary judgment because her actions were narrowly tailored to further a compelling government interest; to wit, maintaining the safety and security of the prison in order to protect both inmates and staff. The Court agrees.

There is no dispute exists that the state has a compelling interest in prison security. See Greene v. Solano County Jail, 513 F.3d 982, 988 (9th Cir. 2008) (citing Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005)). Indeed, "deference is due to institutional officials' expertise in this area." Cutter, 544 U.S. at 725 n.13. Here, Defendant Mantel, relying on her training, knowledge and expertise, concluded, based on the circumstances presented, that the source of the weapon most likely was an African-American inmate located in units C1 through C4. She made this determination based on the ethnicity of the inmates involved in the altercation and the type and location of the weapons found. Decl. Mantel ¶¶ 5-7. The fact that a violent altercation between African-American inmates had already occurred, coupled with the discovery of a second weapon, gave Defendant Mantel serious concern that additional violence between African-American inmates was planned. Id. ¶ 7.

Plaintiff contends that Reddic and Wilson were members of the Bloods and that the portion of the yard where the altercation took place was claimed by the Bloods. He further argues that in light of such facts, the Modified Program should have been more narrowly tailored by applying it only to members of the Bloods who were housed in units C1 through C4. However, the evidence before Defendant Mantel showed that inmates other than Reddic and/or Wilson potentially were connected to the second weapon. Notably, Plaintiff does not assert that the part of the yard where the second plastic weapon was found was also claimed by the Bloods. The second weapon was critical to Mantel's decision to implement the Modified Program because she did not know to whom it belonged, whether it was related to the inmate altercation and whether it meant that someone else might be at risk of future violence. Given that the security of inmates and staff is a compelling state interest, Plaintiff has not established that his constitutional rights were violated because the Modified Program

10

was not more narrowly directed at the Bloods.

Alternatively, Plaintiff argues that the Modified Program was too narrow in that it should have included all inmates housed in units C1 through C4, not just African-American inmates. He predicates this argument on the fact that the plastic weapons could have belonged to an inmate of any race, not just an African-American inmate, and that inmates often place weapons in the claimed area of another racial group when they are told to "prone out" in another racial group's claimed area. However, Plaintiff fails to make any showing that a non-African-American inmate was previously ordered to "prone out" in the area of the yard where the second weapon was found. Accordingly, Plaintiff's contention is nothing more than sheer speculation.[3]

Equally unavailing is Plaintiff's attempt to make much of Defendant Mantel's statement in her denial of Plaintiff's administrative appeal that there is an "effective technique of handling inmates by ethnicity and/or subculture" to maintain control of inmate populations. Plaintiff contends that this statement shows a policy of making race-based decisions. This contention lacks merit. The issue is not whether Defendant Mantel made a race-based decision--which she clearly did; rather, the issue here is whether such a decision was in furtherance of a compelling government interest and was narrowly tailored to further those interests. As discussed, Defendant Mantel had an objectively reasonable and sustainable basis for deciding to apply a Modified Program to African-American inmates in units C1 through C4 for a period of less than a month. Therefore, the Court finds that Defendants have sufficiently demonstrated that Defendant Mantel is entitled to summary judgment.

### D.   Qualified Immunity

Alternatively, Defendants argue that summary judgment is also proper because they are entitled to qualified immunity from liability for civil damages. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their

---

[3] Plaintiff's reliance on Richardson is unavailing. In Richardson, the inmates who participated in the violent altercations were identified, no other weapons were found and there was no indication that other inmates were involved in the violence that led prison officials to institute a lockdown. 594 F.3d at 669-70. Here, as opposed to Richardson, Mantel had sufficient facts showing that there was a security risk affecting African-American inmates in units C1 through C4.

11

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such a right was "clearly established." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (overruling the sequence of the two-part test that required determination of deprivation first and then whether such a right was clearly established, as had been required by Saucier, and holding that a court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that her conduct was unlawful in the situation she confronted. Saucier, 533 U.S. at 201-02.

As noted, in 2010, the Ninth Circuit held in Richardson that when prison officials use racial classifications in response to prison disturbances, they have the burden of showing that "the racial classification was the least restrictive alternative," meaning that the classification was narrowly tailored to meet legitimate prison goals. Richardson, 594 F.3d at 671. Richardson was rendered after the incident, which occurred in 2009. However, Richardson cited Johnson, a 2005 case which announced a strict scrutiny standard for racial classifications in prison, requiring the government to prove that such measures were narrowly tailored to further a compelling state interest. See Johnson, 543 U.S. at 505-07. Under the circumstances here--i.e., where there was a violent altercation between two African-American inmates involving a plastic weapon and where a second plastic weapon was found in African-American-claimed territory in the yard--a reasonable officer in Defendant Mantel's position would not have been on notice that her conduct in implementing the Modified Program described above, that was directed at the compelling state interest of maintaining security in the prison, would be clearly unlawful. Therefore, Mantel is entitled to immunity from liability

12

for damages on Plaintiff's equal protection claim and summary judgment is granted to her on this basis. Furthermore, Meza and Lewis are entitled to qualified immunity because no facts demonstrate that they committed a constitutional violation.

## II.     Plaintiff's Cross-Motion for Summary Judgment

Because the parties have filed cross-motions for summary judgment, the Court has considered all of the evidence submitted by Defendants in support of their motion, as well as the admissible evidence submitted by Plaintiff to evaluate whether summary judgment should be granted to him. See Fair Housing Council of Riverside County, Inc., 249 F.3d at 1135.

When considering Plaintiff's cross-motion, the Court must regard as true Defendants' version of the evidence and draw all reasonable inferences in favor of them. Celotex, 477 U.S. at 324. To show that he is entitled to judgment as a matter of law, Plaintiff must establish there is an absence of a genuine issue of material fact and that he has made a showing sufficient to establish the existence of the elements essential to his case. Id. at 322-23. Under Defendants' version of the facts, Plaintiff has not made a showing sufficient to establish that Defendants violated his equal protection rights by applying the Modified Program to African-American inmates housed in units C1 through C4. Accordingly, Plaintiff's motion for summary judgment is DENIED.

## III.    Plaintiff's Motions for Sanctions under Rule 11

Plaintiff has filed two motions for Rule 11 sanctions. Rule 11 allows for sanctions against an attorney, law firm, or party who violates Rule 11(b) by filing a pleading or motion that is, inter alia, frivolous, for an improper purpose, or lacking in evidentiary support. Fed. R.Civ. P. 11. Rule 11(c)(2) provides the procedure for bringing a Rule 11 motion for sanctions. It requires that a separate motion describing the alleged violations be served on the offending party and not filed unless the challenged paper, claim, defense, contention, or denial is not withdrawn or corrected within 21 days after service. The procedural requirements of this so-called "safe harbor" provision are mandatory. Barber v. Miller, 146 F.3d 707, 710 (9th Cir.1998) (citing the predecessor Rule 11(c)(1)(A)). The district court does not have discretion to award sanctions at a party's request absent compliance with the safe harbor provision. Id.

13

Plaintiff's failure to comply with Rule 11's safe harbor provision is fatal to both motions. That notwithstanding, the motions fail on the merits. Plaintiff's first motion complains that Defendants provided conflicting statements regarding when Defendant Lewis was working at SVSP. Defendants acknowledged the error in describing Defendant Lewis's role in their original Answer, and properly rectified the matter by filing an Amended Answer. There is no evidence that such error and subsequent correction was attributable to any bad faith or misconduct by Defendants.

Plaintiff's second motion for sanctions is based on two statements in Defendant Mantel's declarations. In one declaration, she stated that "the ownership of the second weapon could not be determined but the circumstances of its manufacture and discovery suggested that it belonged to one of the black inmates housed in C1 through C4." See Pl.'s Mot. for Sanctions at 3. In another declaration, Defendant Mantel stated that "no evidence was discovered in the course of the investigation that linked all of the black inmates to the incident between inmates Reddic and Wilson and the second stabbing weapon, but the evidence indicated that one or more black inmates besides inmates Reddic and Wilson were connected to the second stabbing weapon." See Pl.'s Second Mot. for Sanctions at 3. Plaintiff argues that these inconsistent statements are prohibited by Rule 11 and that the Court should impose the sanction of judicial estoppel.

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749 (2001). The Supreme Court has identified three non-exclusive factors to determine whether the doctrine of judicial estoppel applies, including: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceedings would create the perception that one court was misled; and (3) whether the party asserting the inconsistent position would receive an unfair advantage or be unfairly detrimental on the opposing party. Id. at 750-51.

14

The statements cited by Plaintiff are not inconsistent. Though worded differently, the gist of both statements by Defendant Mantel is that although the evidence did not point to a particular individual as the owner of the second stabbing weapon, there was evidence to support the conclusion that the second weapon was connected to or owned by one or more African-American inmates. Even if the statements were inconsistent, Defendants have gained no advantage by inducing the Court to accept one statement and later changing position to create the perception that the Court was misled. Thus, there is no basis for the Court to apply the doctrine of equitable estoppel under the circumstances presented.

In conclusion, the Court finds that Plaintiff's motions for sanctions are procedurally defective and substantively without merit. The Court, therefore, DENIES both motions.

## CONCLUSION

In light of the foregoing, the Court orders as follows:

1. Defendants' motion for summary judgment (Dkt. 29.) is GRANTED.

2. Plaintiff's cross-motion for summary judgment (Dkt. 40) is DENIED

3. Plaintiff's motions for sanctions (Dkt. 39 and 55.) are DENIED.

3. The Clerk of the Court shall close the file and terminate all pending matters.

IT IS SO ORDERED.

DATED:2/5/13

SAUNDRA BROWN ARMSTRONG
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

DWIGHT GRANDBERRY,

        Plaintiff,

  v.

G.D.LEWIS et al,

        Defendant.
                           /

Case Number: CV10-04698 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 5, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Dwight Dwayne Grandberry E-01386
California State Prison - Los Angeles County
P.O. Box 4430
Lancaster, CA 93539

Dated: February 5, 2013

                                    Richard W. Wieking, Clerk
                                    By: Lisa Clark, Deputy Clerk

G:\PRO-SE\SBA\CR.10\Grandberry4698.REVISED ver 3 by KKF.frm